CARNAHAN *v.* MAILOMETER CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—PERSONAL INJURIES—COURSE OF EMPLOYMENT.

Where an employee of a manufacturing corporation was engaged to drive a truck, delivering the finished products and bringing in steel, etc., and he was injured while delivering a box of books, by order of the manager, as an accommodation to a stockholder, such injury was not received in the course of his employment authorizing an award under the workmen's compensation act.

2. SAME.

Where the injury was received while carrying the box up a winding stairway, at the request of a woman, although he testified that the box was so heavy he "wouldn't take a chance even around the factory" with it, he was not injured in the course of his employment, even if it be conceded that in taking it to the address given him he was so acting.

Certiorari to Industrial Accident Board. Submitted January 31, 1918. (Docket No. 136.) Decided March 28, 1918.

Clarence G. Carnahan presented his claim for compensation against the Mailometer Company for injuries received in defendant's employ. From an order awarding compensation, defendant and the Frankfort General Insurance Company, insurer, bring certiorari. Reversed.

*Keena, Lightner, Oxtoby & Hanley,* for appellant.

STEERE, J. The only question involved here is whether an injury sustained by plaintiff on June 23, 1916, for which an award was made by the industrial accident board, arose out of and in the course of his employment by the defendant the Mailometer Company.

The Mailometer Company is a Michigan corporation operating a "special machine shop" located at 1093 Jefferson avenue east, in the city of Detroit, engaged in the manufacture of such specialties as "dies, automobile parts, mailing machines, mailometer machines, self-starters for Ford cars;" etc.

Plaintiff was employed by defendant to drive a truck as a "general pick-up man," the scope and nature of his employment as stated by him being as follows:

"My duties were to deliver the finished products and bring steel in and, in fact, as a handy man or roustabout. * * * I was to deliver all the dies and tools made to the different factories in the city, get the different tools they used in the factory and material used and to take away finished products."

But he was not required to lift or carry heavy packages or boxes without assistance, which was as a rule readily available where his duties called him

Plaintiff testified that on or about the 23d day of June, 1916, he was handed a bill of lading by the shipping clerk who said it was for a case of law books, telling him to get them from the Michigan Central freight house when he got time from his regular work and "to deliver them at Mr. Wetmore Hunt's residence, St. Aubin and Jefferson," Mr. Hunt being then one of defendant's stockholders. He attended to this at the noon hour of the following day. When he reached the Michigan Central freight house he found the box weighed about 140 pounds, and knew it was too heavy for him to handle alone; that two men assisted him there and he then took the box to Mr. Hunt's house, at St. Aubin and Jefferson, where he had never been before, and asked the maid who came to the door if there was any one there who could help him carry it in. There being no one, he tried unsuccessfully to get help at the next door and from a man in the street; being in a hurry he then "thought,

pshaw, I can manage that alone," and took the books into the house on his shoulder.

Plaintiff had then delivered this box of books, which had no connection with the business of his employer or the duties for which he was employed, at Mr. Hunt's residence and fully performed without injury to himself the errand upon which he was sent; he states however, in explanation of what followed, that he might have set the box down in the hall upon the first floor but "the lady asked me if I would kindly take it to the second floor. I hesitated, but a man hates to refuse a woman," and, although it was heavier than he ordinarily would try to carry alone and he "wouldn't take a chance even around the factory," he did take a chance at her request and took it up a winding stairway to the second floor. He could not see and his foot slipped on about the sixth step causing the box to tip so "it got me in the back on a side swing" and he felt a snap, but he straightened up and carried it to the second floor. Following this injury, which he stated he did not pay any attention to at first, he continued in his usual employment for some time although he suffered with a lame back which grew worse in spite of medical treatment until he finally became partially paralyzed and totally incapacitated, an X-Ray examination showing "two joints of my spine snapped out of place." He permanently quit his employment for that reason towards the latter part of the following August.

To bring the case within purview of the workmen's compensation law, it was necessary to show that the accidental injury arose out of and in the course of plaintiff's employment. The industrial accident board so found. The contention against such finding is that there is no competent evidence to support it. The nature and circumstances of the accident are not in dispute, neither is it questioned that no charge was made against Hunt for this service. It is indicated

from the record that the testimony of a witness named
Shelby, who stated he was general manager of the
Mailometer Company, was especially regarded as lend-
ing evidential support to the finding of the board. He
testified that the order for this delivery emanated
from him and that it was customary for him to give
such orders as a part of his business and they were
doing it right along, which he stultified by also testify-
ing that he did not mean they "ran an express office or
anything like that," and could not say "it had become
customary because such favors were few;" he also
testified that he hired plaintiff to do whatever he want-
ed him to do, "absolutely," but in describing the na-
ture of his employment said "he was hired to deliver
and pick up anything we needed or delivered from our
factory." Plaintiff himself, who describes his contract
of employment with the corporation substantially as
last above quoted from Shelby, testified that he was in
that employ about four months and there was no de-
liveryman besides himself, he doing all delivering for
the company; that he never but once before made de-
livery at anybody's house, on which occasion he took
a couple of suit cases up to Mr. Sheldrick's brother's
house when his wife was away, and that in making
this delivery for Hunt he would not let it interfere
with the factory business, because there was no hurry.
As he understood the nature of his employment and
performed it such orders and their execution were not
customary nor a part of the business of the factory for
which he worked.

It appears conclusively that such temporary service
was of a casual nature, a mere accommodation under-
taken by the corporation for one of its stockholders
without charge, and in no sense a part of its special
machine shop business in which both Shelby and plain-
tiff were employed. "Uncompensated favors extended
occasionally to its stockholders surely do not consti-

tute a 'business' of a corporation, 'usual' or otherwise."
*LaGrande Laundry Co.* v. *Pillsbury,* 173 Cal. 777.

But passing these questions, and even conceding that in rendering this casual service, as directed, to a stockholder of the corporation during the noon hour, plaintiff was in the usual course of his employment, because obeying an order emanating from the manager under whom he was employed, his own testimony shows that he had executed the order as given and fully performed the service directed before the accident occurred. Neither the nature of his employment nor the special order given him by the shipping clerk can be said to contemplate that after he had succeeded in delivering this heavy box, weighing 140 pounds and containing 100 books, as he estimated, at Mr. Hunt's residence, he would then, at the unreasonable request of some woman whom he hated to refuse, undertake to carry it on his back up a winding stairs to the second floor—an undertaking on which he "wouldn't take a chance even around the factory" with which he was employed. There is no competent evidence in the case to support the finding that an injury resulting from such an undertaking arose out of and in the course of his employment.

The order of the industrial accident board is therefore reversed.

BIRD, MOORE, BROOKE, FELLOWS, and STONE, JJ., concurred. OSTRANDER, C. J., and KUHN, J., did not sit.